# CONTINUATION OF AN APPLICATION FOR A SEARCH WARRANT

I, Heather Williamson, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this continuation of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – one cellular telephone, as described in Attachment A ("the Subject Device")—that are currently in the possession of law enforcement, and the extraction of electronically stored information from the Subject Device, as described in Attachment B.

2. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been since January 2013. I am currently assigned to the Grand Rapids District Office. Previously, I was assigned to the Southwest Border Initiative Group-3 ("SWB-3") and to the Los Angeles Strike Force for approximately six years. The Los Angeles Strike Force is an investigative group jointly led by the DEA and FBI, and composed of several other federal, state, and local agencies that is focused on the disruption of the Mexico-based Sinaloa Cartel. Prior to working as a DEA Special Agent, I completed 20 weeks of training at the DEA Academy in Quantico, Virginia, which included narcotics identification, detection, trafficking, and interdiction; money laundering techniques; asset identification, seizure, and forfeiture; and techniques used by narcotics traffickers to avoid detection by law enforcement officials. I have investigated drug trafficking organizations in relation to violations of federal laws such as unlawful importation of controlled substances,

the distribution of controlled substances, manufacturing controlled substances, and possession with intent to distribute controlled substances, including cocaine, methamphetamine, heroin, and other dangerous drugs, as well as money laundering.

3. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect (lingo) and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the federal and state controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b); and offenses involving money laundering, conspiracy to do the same, and attempts to do the same, in violation of Title 18, United States Code, Sections 1956 and 1957.

4. I know from training and experience that drug traffickers frequently utilize mobile telephones to facilitate drug transactions. Drug traffickers rely upon voice phone services, SMS and MMS text messaging, social media instant messaging services, and electronic mail apps to communicate with suppliers, customers, and confederates. Mobile telephones are portable and phone providers often do not require purchasers or users of the devices to provide their true names and/or

addresses, so drug traffickers often maintain multiple devices to avoid detection by law enforcement. Mobile phones often contain evidence indicative of drug trafficking, including records of incoming and outgoing calls; text messages; photographs of narcotics, coconspirators, or currency; and, in the case of "smart phones," Global Positioning System ("GPS") data indicating the location of the device at given points in time.

5. The information set forth in this continuation is based upon my personal knowledge and participation in the investigation described below, as well as information provided to me by other law enforcement officers. I have not set forth all of the information known to me or known to other law enforcement officers concerning this matter. This continuation is intended to show only that there is sufficient probable cause for the requested search warrant.

6. Based on the information set forth below, there is probable cause to believe that evidence of violations of federal law, specifically Title 21, United States Code, Sections 841 and 846, distribution and possession with intent to distribute controlled substances, and conspiracy to do the same, will be found on the Subject Device, described in Attachment A. The categories of electronically stored information and evidence sought are described in Attachment B.

**IDENTIFICATION OF THE SUBJECT DEVICE TO BE SEARCHED**

7. The property to be searched is a purple Samsung Galaxy Note 9 cell phone seized by law enforcement on December 16, 2020 from the kitchen counter of the address 11922 Cobb Road Delton, MI, hereinafter "**Subject Device**." Subject

Device is currently located at a secure Michigan State Police (MSP) Southwest Enforcement Team (SWET) facility within the Western District of Michigan.

8.  The applied-for warrant would authorize the forensic examination of Subject Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9.  This continuation is based on a DEA, MSP, and SWET investigation into the drug trafficking activities of the DENNIS BOZE DRUG TRAFFICKING ORGANIZATION ("BOZE DTO"), to include targets DENNIS BOZE, LARRY MARTZ, SARA WHITTEMORE, and other known and unknown drug associates.  The BOZE DTO is suspected to be headed by Dennis BOZE and Larry MARTZ, who both reside in Allegan County, Michigan area (until his arrest and sentencing, now MARTZ is in federal prison serving a 120-month sentence for his involvement in this conspiracy), and coordinate the shipments of methamphetamine from known and unknown sources of supply ("SOSs") located in Battle Creek, Kalamazoo, Muskegon, and Chicago, Illinois. DEA and SWET have utilized Undercover Officers ("UC") and Confidential Sources ("CS") to conduct multiple controlled purchases of crystal methamphetamine from members of the BOZE DTO, which has allowed investigators to identify and charge various SOSs: Charles Hudson, a Battle Creek SOS (No. 1:20-cr-156); Timothy Calicutt and Dwayne Parks, Kalamazoo SOS (No. 1:20-cr-157); and Jackie Cherry and John Galbreath, Muskegon SOS (No. 1:20-cr-175). Investigators have also identified a multi-pound Chicago-based SOS who is currently the lead subject in an ongoing U.S. Postal Inspection Service investigation.

10.  During the course of the investigation, investigators identified CHAD

LEONARD as a drug source of supply via physical surveillance, CS information and controlled drug purchases utilizing a SWET UC.

11. Specifically, on May 14, 2020, investigators seized 180 grams (over 6 ounces) of crystal methamphetamine (99% pure) from MARTZ and WHITTEMORE after they purchased it from GALBREATH and CHERRY in Muskegon. During subsequent interviews, MARTZ and WHITTEMORE stated that they intended to distribute a portion of that crystal methamphetamine to LEONARD for further distribution.

12. LEONARD'S criminal history includes prior convictions for Felony Flee/Elude Police Officer (2010), Operating/Maintaining Lab Involving Methamphetamine (2010), Misdemeanor Traffic Violations, and Misdemeanor Malicious Use of a Telecommunications Service and Domestic Violence (2019).

13. On July 20, 2021, a federal grand jury sitting in the Western District of Michigan returned an indictment against LEONARD charging him with three counts of distribution of 5 grams or more of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii), based on controlled purchases by a SWET UC, as described below.

14. Law enforcement learned from at least one CS[1] that LEONARD was selling ounce quantities of crystal methamphetamine out of 11922 Cobb Road Delton, MI. In the

---

[1] CS-1 has been a cooperating informant with SWET since October of 2020. CS-1 has conducted approximately 3 controlled purchases and 1 undercover introduction from an individual who is associated with the BOZE DTO. CS-1 is cooperating with law enforcement for monetary compensation. CS-1's criminal history includes convictions for misdemeanor assault or assault and battery, misdemeanor use of marihuana, misdemeanor disturbing the peace, misdemeanor larceny less than $200, misdemeanor trespass, and misdemeanor domestic violence. SWET officers have deemed CS-1 reliable based on the controlled buys, introductions made to undercover officers and information provided to SWET.

spring of 2020, local law enforcement responded to 11922 Cobb Road Delton, MI and encountered LEONARD as a resident of 11922 Cobb Road Delton, MI.

15. Additionally, the Barry County Assessor's Office lists "Thomas G & Nancy J Leonard" as the owners of the 11922 Cobb Road Delton, MI. These two individuals are believed to be related to LEONARD, with Thomas possibly being his brother. Based on my training and experience, I know drug traffickers often title property or vehicles in the names of other individuals to avoid law enforcement detection.

16. According to law enforcement databases, including the MSP Automated Incident Capture System and the law enforcement portal of the Michigan Secretary of State, LEONARD lists 11922 Cobb Road Delton, MI as his residence.

17. During the course of this investigation, law enforcement officers have attempted to conduct physical surveillance at 11922 Cobb Road Delton, MI. However, 11922 Cobb Road Delton, MI is not amenable to physical surveillance by law enforcement. 11922 Cobb Road Delton, MI is located on a rural road and is isolated, set back from the street. More importantly, law enforcement has identified numerous surveillance cameras that cover the property, in addition to a motion sensor at the entrance of the driveway. As discussed below, investigators have conducted three controlled drug purchases directly from LEONARD at 11922 Cobb Road Delton, MI. While inside 11922 Cobb Road Delton, MI, the UC observed multiple televisions programmed to capture the surveillance camera footage. Accordingly, law enforcement officers concluded physical surveillance of 11922 Cobb Road Delton, MI was too risky and has not been conducted.

18. Between October and November 2020, a SWET CS conducted three controlled purchases for a quantity of crystal methamphetamine from LEONARD at 11922 Cobb Road Delton, MI. Each of these controlled purchases consisted of gram quantity amounts of crystal

methamphetamine utilizing SWET pre-recorded buy money. The CS was driven to the 11922 Cobb Road Delton, MI by a SWET UC for the purpose of ultimately introducing the UC to buy directly from LEONARD.

19. On November 12, 2020, a SWET UC purchased approximately 7.9 (including packaging) grams of crystal methamphetamine directly from LEONARD using $300 pre-recorded SWET buy money. On November 19, 2020, a SWET UC purchased approximately 29.5 grams of crystal methamphetamine (including packaging) from LEONARD using $1,200 pre-recorded DEA buy money. On December 3, 2020, a SWET UC purchased approximately 29.7 grams of crystal methamphetamine from LEONARD using $1,100 pre-recorded DEA buy money. The crystal methamphetamine purchased from LEONARD on November 12, 2020, November 19, 2020 and December 3, 2020 field tested as crystal methamphetamine. Each of the SWET UC purchases of crystal methamphetamine from LEONARD occurred at 11922 Cobb Rd. Delton, MI. The DEA laboratory confirmed that each of these three substances were 5 grams or more of methamphetamine.

20. On December 11, 2020, I sought and obtained a federal search warrant for the address of 11922 Cobb Rd. Delton, MI through the United States District Court for the Western District of Michigan. The search warrant was executed on December 16, 2020 at approximately 5:00 a.m. During the search, investigators located and seized the Subject Device, which was found on the kitchen counter inside 11922 Cobb Road, Delton, MI.

21. SWET UC viewed the Subject Device and confirmed that it was the cellular phone he/she personally observed in the possession of LEONARD during the controlled purchases described above. The Subject Device has remained in the possession of law enforcement since December 16, 2020, the date of seizure, and been secured in a state such that the data contained on the Subject Device has not been modified or altered since the date

of seizure.

## TECHNICAL TERMS

22.     Based on my training and experience, I use the following technical terms to convey the following meanings:

> a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations

where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers

    have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

  f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

23. Based on my training, experience, and research, I know that the Subject Device has capabilities that allows it to serve as a wireless telephone, digital camera, portable media player, and GPS navigation device. It also likely has the ability to connect to the internet and was likely assigned Internet IP Addresses when connecting to the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

25. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also

forensic evidence that establishes how the Subject Device was used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on Subject Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore,

    contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

26. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of Subject Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

27. *Manner of execution.* Because this warrant seeks only permission to examine Subject Device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

28. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of Subject Device described in Attachment A to seek the items described in Attachment B.